BANKHAUS HERMANN LAMPE
KG, Plaintiff,

v.

MERCANTILE–SAFE DEPOSIT AND
TRUST COMPANY, ACF Industries, In-
corporated, American Bank Note Com-
pany, Emery Air Freight Corporation
and National Airlines, Inc., Defendants.

No. 74 Civ. 1423 (VLB).

United States District Court,
S. D. New York.

Jan. 11, 1979.

Guggenheimer & Untermyer, New York City, for plaintiff.

Cravath, Swaine & Moore, New York City, for defendant Mercantile.

Cahill, Gordon & Reindel, New York City, for defendant ACF.

Doran & Cunningham, New York City, for defendant National.

Bigham, Englar, Jones & Houston, New York City, for defendant Emery.

Gottesman, Wolgel & Smith, New York City, for defendant American.

MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

I

*Introduction*

This case arises out of the theft of a shipment of a series of equipment trust certificate engravings from Kennedy International Airport in New York ("Kennedy") on March 22, 1973, and subsequent use of the engravings as collateral for a loan obtained from plaintiff Bankhaus Hermann Lampe KG ("Bankhaus"), a German banking company. This court has jurisdiction under 28 U.S.C. § 1332(a): the plaintiff is a citizen of Germany and the defendants are citizens of various of the United States. More than $10,000 is in controversy.

In this action plaintiff seeks the registration as securities of defendant ACF Industries, Inc. ("ACF") of the engravings it retains. Alternatively, Bankhaus seeks damages from all defendants for the money it loaned in the transaction in which the engravings served as collateral. This action is now before me on defendants' motions for summary judgment. For the reasons hereafter stated, defendants' motions are granted and the action is dismissed.

II

*The Agreements*

a) *ACF and Mercantile*

Defendant ACF is a corporation incorporated under the laws of the State of New Jersey and having its principal place of business in the State of New York. Defendant Mercantile Safe Deposit and Trust Company ("Mercantile") is a corporation incorporated under the laws of and having its principal place of business in the State of Maryland.

On March 15, 1973, pursuant to a decision by ACF to raise funds through the issuance and sale of a series of equipment trust certificates, ACF and Mercantile entered into an equipment trust agreement ("the Trust Agreement"), with Mercantile as

trustee.[1] The Trust Agreement created ACF Industries Equipment Trust, Series B and provided for the issuance of 7.95% Sinking Fund Trust Certificates ("the Trust Certificates") in the aggregate principal amount of $25,000,000. The Trust Certificates were to be issued as fully registered in denominations of $1,000 and multiples thereof.

b) *ACF and American Bank Note*

Defendant American Bank Note Company ("American") is an engraver and printer of corporate securities and other engraved instruments. American is purported to be the largest such engraver in the country.

ACF initially contacted American on March 1, 1973 and accepted a quotation the following day for the printing of the Trust Certificates. A proof dated March 2, 1973 was prepared, and the parties approved this and subsequent proofs.

On March 14, 1973 ACF received from American and executed a form of authorization. Pursuant to this authorization, American printed the agreed upon forms ("the engravings"). Each engraving as printed bore the facsimile signature of R. F. Ziemski, Vice President of Mercantile, and the facsimile seal of Mercantile. The engravings as printed were undated, and a space on each for the attestation signature of the Assistant Corporate Officer of Mercantile was left blank. On each engraving the spaces for the name of the registered owner and the dollar amount were also left blank.

The agreement between ACF and American provided for delivery of the engravings F.O.B. New York and shipment to Mercantile in Baltimore, Maryland by air freight.[2]

c) *American and Emery*

On March 21, 1973 American at its Bronx plant consigned a two carton shipment to defendant Emery Air Freight Corporation ("Emery"), a major air freight company with which American had dealt for many years and to which American gave a large part of its business. The consignment, the contents of which were described as "Printed Matter", contained some 12,000 of the ACF engravings.

d) *Emery and National*

On March 22, 1973 Emery entered into an agreement with National Airlines, Inc. ("National"). Per the agreement, Emery was to deliver the two carton ACF shipment to National's facilities at Kennedy. National agreed to receive the shipment and transport it to Baltimore, Maryland. The shipment was then to be delivered to Emery at National's facilities within that city.

The two cartons were turned over by Emery to National at Kennedy that same day.

*The Loss of the Engravings—Notification to Authorities*

On March 22, 1973, Mr. Borst, Assistant Treasurer of ACF, received a telephone call from Mr. Allfree, sales representative of

---

1. This method of raising funds is a customary practice for ACF and other similarly situated companies. It is a form of public financing wherein the borrower (ACF) enters into a trust agreement with a trustee (Mercantile). Property (here, railroad cars) is conveyed to the trustee to hold as security. Under the trust agreement, the borrower leases back the equipment and pays rental fees to the trustee. The borrower guarantees Equipment Trust Certificates which are issued by the trustee. The interest is payable out of the rentals received by the trustee from the borrower. The payment of interest, and of the principal when due, is secured by the equipment held and rental fees received by the trustee.

2. American argues that, due to the provision in its agreement with ACF that delivery was F.O.B. New York, "American's duty as to the Incomplete Engravings was completed upon their delivery to Emery [in New York] and prepayment of all freight expenses. Thereafter, the risk of their loss passed to ACF." (Memorandum of Law in Support of Motion by Defendant American Bank Note Company for Summary Judgment Pursuant to Rule 56 of the Federal Rules of Civil Procedure at p. 14). In light of my disposition of the motions for summary judgment on the ground of contributory negligence (*see* Section V, *infra*), I do not reach this issue.

American, informing him that the two cartons of ACF engravings had not been received as scheduled by Mercantile. An arrangement was made that if the engravings were not located, American would reprint them in a different color using different serial numbers.

It is not altogether clear whether the engravings were initially lost or actually stolen, but they disappeared on March 22, 1973 from Kennedy. The disappearance triggered a series of events which eventually culminated in criminal conduct on the part of third persons, the most relevant person being one Jorn Grimmsmann who presented certain of the engravings to plaintiff Bankhaus in Germany as collateral for a loan (*see infra* at p. 1138).[3]

Subsequent to the loss of the engravings, Mr. Allfree "informed Mr. Borst that American Bank Note would undertake all necessary actions to locate the missing shipment through the proper authorities. . . ." American in fact notified various agencies of the missing shipment. These agencies included the New York City Police Department, the New York Port Authority police, the New York Stock Exchange, the National Association of Securities Dealers, the American Bankers Association, the American Stock Exchange, the American Banker (a trade publication) and SCITEK (a private agency which informs subscribers in the financial community with respect to lost or stolen securities). No notices were sent to Interpol, the Association of International Bond Dealers, or other non-domestic organizations.

*Plaintiff Bankhaus*

Plaintiff Bankhaus is a German bank in the form of a limited partnership. As such, it is managed by a general partner and other limited partners rather than by directors in the domestic corporate sense of the word. It is a "general bank"—it accepts deposits and makes loans, arranges for mortgages and other monies, advises customers with respect to capital investments, and handles securities for its own accounts and for the accounts of its customers.

Until 1973 plaintiff Bankhaus had had limited experience with American securities. The securities handled for the bank's own account were in large part German. If the securities for the accounts of the bank's customers were to be bought and sold on non-German exchanges, the transactions were handled by foreign correspondent banks or business associates of Bankhaus. Prior to making a loan to Jorn Grimmsmann in April, 1973 (*see infra* at p. 1138), Bankhaus had not entered into any transactions involving American equipment trust certificates. During the period from January 1, 1970 until April, 1973, Bankhaus had not dealt with any American securities as collateral for loans it made. In short, Bankhaus personnel were not specialists in American securities.

*Bankhaus' Dealings with Jorn Grimmsmann—The Loan*

In July, 1972 the manager of Bankhaus' Hamburg branch, Joachim Kebschull, was introduced to one Jorn Grimmsmann by a client of the bank. In August, Kebschull, through Grimmsmann's offices, met two German publishers with whom Kebschull discussed the financing of paper imports. After this discussion, and in light of the favorable impression Kebschull had formed of Grimmsmann's relationship with the publishers, Bankhaus decided to accept

---

**3.** In its first affirmative defense, National states that it lost the two cartons containing the engravings. Counsel for plaintiff Bank states that "[t]here is no dispute" that the cartons were "stolen" at Kennedy Airport. Defendant ACF asserts that the 'loss' was the result of a theft of the engravings from the premises of the forwarder or air carrier at Kennedy Airport. In the opinion and verdict of the German Court, which resulted in the sentencing of Jorn

Grimmsmann on a related matter (*see infra* at p. 1140), the Court found that the engravings "had either been stolen at Kennedy Airport or first merely lost and then misappropriated." *See* German Court's opinion in the criminal proceedings against A. Flom and J. Grimmsmann (translated) at 28 (April 2, 1976). In any event, I do not find this to be a material fact in dispute.

Grimmsmann as a client. Factors relevant to this determination were 1) the possibility of further contacts through Grimmsmann with publishing people; 2) information from Grimmsmann that he managed substantial deposits of money belonging to others; and 3) a credit report on Grimmsmann as a member of the Board of Confida, A. G. (a chartered public accounting firm) which report indicated that he was above reproach.[4]

During the second half of 1972 Bankhaus declined to grant Grimmsmann loans "regarding discounting Notes or advances on securities of non-registered loans." These dealings with Grimmsmann led, however "to a sole possibility of working with the securities loan of stock market totally free securities, since allegedly there existed large deposits in behalf of third parties which were being managed."

In the early part of 1973 Grimmsmann informed Kebschull that he expected to receive a shipment of American securities which he would deliver to the Bank as collateral for a loan. Grimmsmann represented to Kebschull that he was acting on behalf of an American estate. He explained that the heirs wanted to dispose of the securities in Germany due to American tax considerations.

In February, 1973 Grimmsmann applied to the Hamburg branch of Bankhaus for a personal loan of DM 7,000,000, or approximately $2,410,800.[5]

On February 23, the Hamburg branch of Bankhaus forwarded a "Rush Resolution" to a Mr. Winterhoff at its Bielefeld branch. The resolution outlined Grimmsmann's request for a loan with an interest rate of 9.5% per annum.[6] The collateral was to be Treasury bills and "American Stock mostly Blue Chips," including Singer Co., Polaroid Corp., Amerada Hess Corp. Pref., Atlantic Richfield, Sony Corp., Natamos, Disney, Gulf Oil, Fairchild Camera, and General Electric.

On February 26, 1973 Bankhaus' Central Credit Office approved the above Rush Resolution "subject to the following provisions:

1) Maximum borrowing limit: 50% of securities

2) Each security delivered shall be examined as to its borrowing capacity."

A formal loan resolution dated March 22, 1973 was then submitted. This resolution recited the same interest rate that had been indicated and the same securities that had been listed on the Rush Resolution. Neither the Rush Resolution nor the loan resolution mentioned ACF securities.

On April 17, 1973 Grimmsmann appeared at Bankhaus' Hamburg branch with 80 purported ACF Trust Certificates that appeared to have a face value of $650,000. These "Trust Certificates," and those which Bankhaus thereafter received from Grimmsmann, were in fact a part of the ACF engravings which had disappeared from Kennedy (see supra at pp. 1136–1137). Grimmsmann explained to Kebschull and another Bankhaus official that these engravings were the first shipment of securities from the United States. The bank accepted the engravings and issued a receipt.[7] Grimmsmann signed signature cards, an application for a deposit account,

---

4. The position thought to be held by Grimmsmann, that of Wirtschaftspruefer, a chartered public accountant, purportedly is one of high professional prestige in Germany.

   However, the following statement is found in a Loan Report summarizing the "Grimmsmann Complex" written for Bankhaus on June 22, 1973: *"These inquiries . . . did reveal that Grimmsmann is not an accountant, contrary to the information given in the loan request."* (emphasis in original).

5. This calculation is based on the February 23, 1973 edition of the *Wall Street Journal*, which values the Deutschmark at U.S. $0.3444.

6. Mr. Winterhoff was a member of Bankhaus' Credit Committee, in Bielefeld. An application for a loan of DM 7,000,000 needed the Credit Committee's approval. The purpose of a "Rush Resolution" is to expedite processing of a loan.

7. In German banking circles the "overwhelming majority" of security transfers is from one bank to another. Actual physical deliveries by an individual to a bank are rare.

and a collateral agreement. Kebschull informed Grimmsmann that the bank would have to determine the credit rating of ACF and the negotiability of the presented engravings before making a loan.

On the same day Bankhaus' Hamburg branch forwarded a photocopy of one of the engravings presented by Grimmsmann to Bankhaus' legal department in Bielefeld and another photocopy to Bankhaus' stock exchange department in Duesseldorf. The stock exchange department informed the Hamburg branch by telephone that a confirmation of the legitimacy of the certificates by sending the originals to the United States would take about six months, but that ACF's credit rating was "good" and "that the Certificates were favorably considered and were negotiable."[8] The legal department responded by letter; the department found the engravings to be negotiable, but recommended that a power of sale be obtained from Grimmsmann.[9] Bankhaus never requested such a power.

On April 19, 1973, prior to having received the above response from its legal department, the Hamburg branch of Bankhaus advanced $140,000 by check to Grimmsmann. "The overwhelming consideration in making the advance to Grimmsmann was . . . the fact that he was believed to be a Wirtschaftspruefer, and as such entitled to the highest confidence and trust."[10] Other factors included the information received from Bankhaus' stock exchange department and the credit information obtained with respect to Grimmsmann.

On April 24, 1973 Bankhaus received from Grimmsmann a second batch of ACF engravings, which appeared to have a face value of $1,360,000 and for which a receipt was issued. That same day Bankhaus issued a second check to Grimmsmann in the amount of $800,000. Two days later, another check was issued to Grimmsmann for $65,000. This payment brought the total amount paid out to Grimmsmann ($1,005,-000) to 50% of the purported face value of the engravings.[11]

Soon thereafter Grimmsmann requested that the allowable amount of his loan, relative to the apparent face value of the delivered engravings, be raised from 50% to 70%. He represented that he could use the additional $400,000 to purchase more stock, purportedly valued at $4.8 million, in the United States. The bank's management at first refused but reconsidered upon Grimmsmann's assurance that the additional funds would be needed for only 24 hours—enough time for Grimmsmann to fly to New York and return to Hamburg with the additional securities. Bankhaus then consented to the loan increase on the condition that the new securities obtained by Grimmsmann would

---

8. Approximately 3 weeks later Bankhaus made inquiry of two American stock brokerage firms with respect to the legitimacy of the engravings and received definitive information concerning their inadequacies within 24 hours (*infra*, pp. 1139–1140).

9. The letter from the Legal Department, written in German, has given rise to a dispute as to the appropriate translation. Defendant ACF offers the following translation: "It appears from the bonds of ACF Industries, Inc. that only the person who is registered as *bondholder* can derive rights from them. We assume that Mr. Grimmsmann is registered as *bondholder*." *Id.* (emphasis added). Defendant ACF then points out that the instrument examined by the Legal Department purported to certify that "Bald & Co." was the registered holder and, therefore, that the Legal Department's assumption was erroneous. Plaintiff argues that the word "bondholder" should be translated as "owner," and that the Legal Department's assumptions were that Grimms-

mann was an *owner* and that Grimmsmann was a registered holder on some books and records somewhere.

The Legal Department's suggestion that a power of sale be obtained from Grimmsmann was to facilitate a future sale of the engravings, so that a prospective buyer could "receive his property directly from Mr. Grimmsmann . . and could have himself registered as direct buyer from Mr. Grimmsmann in the loans of his proxy." *See* Legal Department Letter.

10. *See supra* n. 4.

11. Bankhaus states the purported face value of the second batch of engravings received by Bankhaus to be $1,310,000. The $1,360,000 figure is probably the correct one. $1,005,000 (the amount loaned to Grimmsmann) is exactly 50% of a purported face value of $2,010,000, the total of $650,000 (the value of the first batch of engravings) and $1,360,000.

be deposited with Bankhaus by May 7. A $400,000 check was issued to Grimmsmann on May 4, 1973, a Friday.

On May 7 Grimmsmann informed Bankhaus by telephone from Paris that he could not contact his New York correspondent due to a delay in his flight schedule. He asked for an extension until Thursday, May 10, 1973. "It then turned out that the check [Bankhaus] had originally given to Mr. Grimmsmann had been immediately presented to the Hamburg Branch and that they had cashed it for Mr. Grimmsmann."

Bankhaus became "suspicious." It made immediate inquiry with respect to the engravings through the European offices of two American stock brokerage firms, Merrill, Lynch, Pierce, Fenner and Smith ("Merrill Lynch") and Smith Barney. As a result of these inquiries, Bankhaus finally became aware on May 8 that the ACF engravings had been either lost or stolen. Merrill Lynch notified Bankhaus "that these certificates are very suspicious," and drew attention to the fact that the certificates were neither countersigned by an assistant corporate trust officer of Mercantile nor dated. On that same day Bankhaus informed the German Federal Criminal Police Department that the ACF engravings had been used as collateral for loans to Grimmsmann. (Ultimately Grimmsmann was sentenced by a German court for continuing professional receiving of stolen goods and continuing joint fraud).

Bankhaus' central management then asked the head of its Central Audit Department, Hans List, to investigate the affair. List's report, based on the documents and memoranda in Bankhaus' possession and other information received by Bankhaus, concluded that there was no correlation between the "engravings" pledged and the stocks which Grimmsmann had undertaken to provide as collateral; that there had been a lack of internal coordination at Bankhaus with respect to the loans to Grimmsmann; and that the suitability of the engravings as collateral had not been determined as of the time the loans to Grimmsmann had been made:

"1) The stocks on which the branch loaned the money and the stocks listed for pledge in the decision do not correspond.

2) There is a discrepancy between the data of the Hamburg branch and the Dusseldorf Stock Exchange Department as regards the time elapsed and the relative intents of the understandings reached chiefly by telephone in connection with the examination of the stocks delivered.

3) The decisive questions relative to the acceptability of the stocks as collateral, to wit,

a) The legally unobjectionable format of the items (the stocks 'are not countersigned by assistant corporate trust officer'), and

b) The provenance of the stocks

had not been clarified at the time of the loan valuation."

## III

*Summary Judgment*

"[Summary judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. "[O]n a motion for summary judgment the court cannot try issues of fact; it can only determine whether there are issues to be tried . . . Moreover, . . . it must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought." *Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d 1317, 1319–20 (2d Cir. 1975). "However, it is equally true that summary judgment should not be denied where the only issues raised are frivolous or immaterial ones which would simply serve to provide an exercise in futility or a purposeless trial for the district court, particularly where no jury has been demanded." *United States v. Matheson*, 532 F.2d 809, 813 (2d Cir.), *cert.*

*denied,* 429 U.S. 823, 97 S.Ct. 75, 50 L.Ed.2d 185 (1976). Summary judgment is appropriate on evidence which would compel a directed verdict for the moving party. *Sartor v. Arkansas Gas Corp.,* 321 U.S. 620, 624, 64 S.Ct. 724, 88 L.Ed. 967 (1944); *United States. v. J. B. Williams Co., Inc.,* 498 F.2d 414, 432 (2d Cir. 1974), (*citing, inter alia,* 6 Moore's Federal Practice ¶¶ 56.02[10], 56.-04[2], 56.16.)

## IV

*Defendants ACF's and Mercantile's Motions for Summary Judgment on Plaintiff's First Cause of Action*

Plaintiff Bankhaus' first cause of action is asserted against only defendants ACF and Mercantile. In its amended complaint, Bankhaus seeks registration in its name of the engravings which were lost or stolen at Kennedy and subsequently pledged as collateral to plaintiff by Grimmsmann. Plaintiff claims it is a purchaser for value in good faith and without notice.

Defendants' position is that the engravings accepted by plaintiff Bankhaus are not securities; that, in effect, Bankhaus is in possession of worthless pieces of paper. Their argument hinges upon the definition of "security" as provided in Article 8 of the Uniform Commercial Code, and more specifically, upon the interpretation of the word "issued" as contained within that definition.[12] ACF and Mercantile seek summary judgment in their favor.

I find no material facts in dispute, and for the reasons hereinafter stated I grant the motions of ACF and Mercantile for summary judgment on the first cause of action.

## A. *Choice of Law*

■ Since this is a diversity case, this court must apply New York law, including its conflicts of law rules, in determining the law to be applied. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). *See Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

New York has adopted the Uniform Commercial Code. Under UCC § 8–106,[13] the "validity of a security and the rights and duties of the issuer with respect to registration or transfer are governed by the law (including the conflict of laws rules) of the jurisdiction of organization of the issuer."

■ Defendant ACF was organized under the law of New Jersey. Thus New York would apply New Jersey law with respect to questions concerning the validity as securities of the engravings, and the duties of ACF as putative issuer, and so must I. *Klaxon Co. v. Stentor Manufacturing Co., supra.*

## B. *The Engravings are Not Securities*

■ I conclude that under New Jersey law the engravings delivered by Grimmsmann to Bankhaus are not securities.

UCC § 8–102(1) defines a security as follows:

(a) A 'security' is an instrument which

(i) is *issued* in bearer or registered form; *and*

(ii) is of a type commonly dealt in upon securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; *and*

(iii) is either one of a class or series or by its terms is divisible into a class or series of instruments; *and*

(iv) evidences a share, participation or other interest in property or in an enter-

---

**12.** In the alternative, defendants argue that even if I were to decide the engravings in question are securities: (1) the securities are void as a matter of law because they bear forgeries and are not "genuine"; (2) Bankhaus has no right to registration in its name because its transferor was not a registered holder; and (3) Bank-

haus is not a purchaser for value without notice. I do not reach these contentions.

**13.** All references to the code will be made directly to the Uniform Commercial Code and will be cited "UCC § —— — ——."

**1142**

prise or evidences an obligation of the issuer.

(emphasis supplied).

The New Jersey Study Comment to UCC 8–102 [14] notes that to be a security, a document (here the engravings) "must have been issued," which entails that there has been delivery:

3. Though Section 8–201 defines the term "issuer," there is no definition of the term "issue." But, since the provisions of Article 8 only apply to an "instrument" which complies with the requirement of being dealt with as a "medium of investment," *an "issue" would involve the instrument being "delivered."* In this respect *an analogy will have to be drawn with the provisions of Article 3* which in Section 3–102 defines the moment of issue in relation to Commercial Paper. The rights of a subscribing shareholder, which, as the cases show, do not require that a share-certificate shall have been delivered to him, must not be confused with the transfer of such rights as represented by the "security," through the transfer of the security itself. To effectuate such a transfer, the security must have been issued, i. e., must be in circulation as a medium of investment. A "subsequent purchaser" is, therefore, a person who takes the security after it has been "issued" to the seller, and not a person who takes the security directly from the issuer on its first subscription, i. e., on original allotment.

(emphasis supplied).

The analogy to Article 3 stated in the New Jersey Study Comment is objected to by plaintiff, who rightfully points out that

UCC § 3–103(1) clearly states: "This Article [Article 3] does not apply to . . . investment securities." However, it is not my intention to apply Article 3 directly, but rather to extract from it principles that will facilitate the application of Article 8. "Article 3 is much more detailed than Article 8 and contains answers to questions which are raised by the nature of an investment security as 'a negotiable instrument.' It is therefore appropriate to look to UCC Article 3 for *guidance* in seeking answers not given by Article 8." (Emphasis in original). C. Israels and E. Guttman, *Modern Securities Transfers* 5 (1971).[15]

Turning to UCC § 3–102(1), we find: "(a) 'Issue' means the first delivery of an instrument to a holder or remitter."

Delivery, in turn, is defined in UCC § 1–201: "(14) 'Delivery' with respect to instruments . . . or securities means *voluntary transfer of possession.*" (emphasis supplied).

In the case before me, the engravings were either lost or stolen on March 22, 1973 at Kennedy (or while en route from New York to Baltimore). Neither defendant ACF nor defendant Mercantile had ever been in possession of those engravings—and no one else could issue them. Thus there was no possibility of a "voluntary transfer of possession" representing first delivery to a holder or remitter. The engravings, now in the hands of plaintiff Bankhaus, were never issued, and therefore are not securities.

A somewhat different line of reasoning was employed in a New York State court

---

**14.** 12A N.J.Stat.Ann. at 133 (West 1962).

**15.** *See also* Guttman, *Article 8—Investment Securities,* 17 Rutgers L.Rev. 136, 140 (1962), where the author states:

Before there can be a lien on a security binding on a purchaser and before a security can be made negotiable, it must have been delivered. In general, corporation laws have never made requirements for delivery in order for the obligations between corporation and stockholder to arise. The certificate of corporate stock is mere evidence of ownership and need merely be *allotted,* but not

delivered, to vest a person with the rights of a stockholder. But there can be no transfer of a security unless it has been delivered. Thus, 'issue,' which is nowhere defined in Article 8, must include a 'delivery.' In this respect, by analogy to Article 3, an issue would take place on first delivery of a security. (Footnotes omitted; emphasis in original).

*See also E. F. Hutton & Co. v. Manufacturers National Bank of Detroit,* 259 F.Supp. 513, 517 (E.D.Mich.1966); C. Israels and E. Guttman, Modern Securities Transfers 10 (1971).

decision where it was also determined that a voluntary transfer is essential for issuance:

> No effort was made by the plaintiff to discuss the meaning of 'issued' as used by the statute [8–102(1)(a)], the plaintiff adopting the argument that if the security *appears* regular on its face, it is an issued security. The plaintiff argues further that as its assureds were bona fide purchasers (UCC § 8–302), they must prevail.
>
> The threshold question is not whether the brokerage houses were bona fide purchasers but whether or not the certificates were securities at all, whether or not they were issued. While, as is indicated above, the word 'issued' as such is not defined in a code replete with definitions, an 'issuer' is defined (UCC § 8–201): . . . [16]
>
> Clearly, an act of volition is intended. This conclusion is supported by the definition of "Purchase" (UCC § 1–201[32]) which 'includes taking by . . . issue or reissue . . . or any other *voluntary transactions* creating an interest in property' "

*Continental Insurance Co. v. Yankee Plastics, Inc.,* 21 UCC Rep.Serv. 621, 622–23, N.Y.L.J., April 14, 1977, at 10, col. 3 (Sup. Ct., N.Y.Co.1977) (emphasis in original).[17]

▇ The definition of "security" in U.C.C. § 8–102 has functional components,[18] and plaintiff Bankhaus argues that emphasis should be placed upon the functional rather than the formalistic aspects of the definition.

Thus plaintiff refers to the New Jersey Study Comment to UCC § 8–102, which states:

> The definition of "security" is functional rather than formal, and it is believed will cover anything which securities markets, including not only the organized exchanges but as well the "over-the-counter" markets, are likely to regard as suitable for trading.[19]

That statement stresses the broad scope of Article 8, and does not—indeed cannot—deny the formal requirements in fact spelled out in U.C.C. § 8–102. The functional aspects give the commercial public the flexibility to invent new types of investment securities. When new types of investment vehicles are developed, they too must conform to the statutory formal requirements if they are to be recognized as securities.[20]

Plaintiff suggests that the New Jersey Study Comment to UCC § 8–102 equates "issued" to being "in circulation as a medium of investment." "To effectuate such a transfer, the security must have been is-

---

**16.** The court recites UCC § 8–201:
(1) With respect to obligations on or defenses to a security "issuer" includes a person who
(a) places or authorizes the placing of his name on a security (otherwise than as authenticating trustee, registrar, transfer agent or the like) to evidence that it represented a share, participation or other interest in his property or in an enterprise or to evidence his duty to perform an obligation evidenced by the security; or
(b) directly or indirectly creates fractional interests in his rights or property which fractional interests are evidenced by securities; or
(c) becomes responsible for or in place of any other person described as an issuer in this section.

**17.** Plaintiff Bankhaus has discussed the meaning of "issued" as contained in UCC § 8–102(1)(a). However, as did the plaintiff in *Yankee Plastics,* plaintiff has resorted to the argu-

ment that if the "security" appears regular on its face, it is an issued security.

There are inherent difficulties with a certificate that appears regular on its face yet which was never voluntarily transferred, or "issued." I shall examine these difficulties *infra* at n. 26.

**18.** *See* Israels, *How to Handle Transfers of Stock, Bonds and Other Investment Securities,* 19 Bus.Law 90, 90 (1963). *See also* Israels, *Stop-Transfer Procedures and the Securities Act of 1933—Addendum to Uniform Commercial Code—Article 8,* 17 Rutgers L.Rev. 158 (1962) (the definition in UCC 8–102 "is functional and is directly related to the criterion of marketability. . . ."); New Jersey Study Comment appended to UCC § 8–102, 12A N.J. Stat.Ann. at 131 (West 1962).

**19.** 12A N.J.Stat.Ann. at 134 (West 1962).

**20.** *See e. g.* Guttman, *Article 8—Investment Securities,* 17 Rutgers L.Rev. 136, 138 (1962).

sued, i. e. must be in circulation as a medium of investment." [21] Here the New Jersey Study Comment has distinguished the rights of a subscribing shareholder, which exist whether or not a share certificate has been delivered, from the rights of a transferee, whose rights, if any, are represented by the share certificate or security itself. With respect to such a transferee shareholder, issuance is a precondition of transfer, and hence of the transferee's becoming a shareholder.

The New Jersey Study Comment explains that the test "is not purely a functional one but includes a number of formal requirements. The security must be 'issued in bearer or registered form.' " [22]

■ The fact of formal requirements may not be universally acclaimed, but it exists and is recognized: "Thus, it is to be regretted that although the Code requires [that to be a security the investment must be of a type commonly dealt in upon securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment], certain formal requirements are also appended to the definition of an investment security." [23] Regrettable or not, the fact is that "issuance" is indeed essential for the creation of a "security." [24]

■ Plaintiff Bankhaus also seeks refuge under UCC §§ 8–202(4), 8–205, and 8–206.

UCC § 8–202(4) provides:

All other defenses of the issuer including nondelivery and conditional delivery of a security are ineffective against a purchaser for value who has taken without notice of the particular defense.

Plaintiff claims that "[b]y seeking to incorporate the full concept of an Article 3 'delivery' into a definition of 'issued,' ACF and Mercantile are seeking to assert a defense which is denied to them by § 8–202(4)." Defendants counter this proposition by stating that their defense is one of "non-issue" and not of "non-delivery." I agree with defendants.

UCC § 8–202(4) "deals with 'defenses', as opposed to defects." It does not treat "the right of a purchaser to recover; it deals with the defenses which an issuer may assert against such a purchaser." Plaintiff must "establish the basis for its claim before deciding what defenses may be raised against it." *Dean Witter & Co., Inc. v. Educational Computer Corp. (PA),* 369 F.Supp. 757, 763 (E.D.Pa.1974).

■■ To establish such a "basis" plaintiff must be a *bona fide* purchaser under UCC § 8–302, that is, "a purchaser for value in good faith and without notice of any adverse claim who takes delivery of a *security* . . . ." (emphasis supplied). A security must be "issued" under UCC § 8–102. Issuance *refers to the first* delivery to a holder or remitter. Furthermore, under UCC § 8–206 the rights of a bona fide purchaser for value attach to any instrument which contains the signatures necessary to its issue as a security; no such rights attach where signatures necessary to its issue are missing:

(1) Where a security contains the signatures necessary to its issue or transfer but is incomplete in any other respect

(a) any person may complete it by filling in the blanks as authorized; and

(b) even though the blanks are incorrectly filled in, the security as completed is enforceable by a purchaser who took it for value and without notice of such incorrectness.

(2) A complete security which has been improperly altered even though . fraudulently remains enforceable but only according to its original terms.

■ Reading UCC §§ 8–102, 8–202(4), 8–206, and 8–302 together, the defense of non-delivery speaks to only those deliveries

---

**21.** *See supra* note 14 and accompanying text.

**22.** 12A N.J.Stat.Ann. at 132 (West 1962).

**23.** Guttman, *Article 8—Investment Securities,* 17 Rutgers L.Rev. 136, 138 (1962).

**24.** Even Professor Guttman, a critic of the formal requirements of UCC § 8–102, has defined "issue" as the first delivery of a security. *See supra* note 15.

subsequent to the first delivery. Any question as to the first voluntary transfer must be decided under UCC § 8–102 to determine the validity of the instrument as a security.

UCC § 8–205 deals with the effect of an unauthorized signature prior to or in the course of issue.[25] Such a signature is ineffective unless placed there by a person entrusted by the issuer with responsibility for signing or preparation for signing or "with responsible handling of the security." In the context of this case U.C.C. § 8–205 has no application.

▮▮▮▮▮ The result reached herein is required by the Uniform Commercial Code and, on the facts of the case before me, clearly is just.[26]

## V

*Motions by All Defendants for Summary Judgment on Plaintiff's Second and Third Causes of Action*

Plaintiff's second and third causes of action are against all defendants. Bankhaus claims that the defendants were negligent in the transportation of the ACF engravings in that they knew or should have known that such engravings are frequently stolen from airports and often received for

---

25. UCC § 8–205 provides:

> An unauthorized signature placed on a security prior to or in the course of issue is ineffective except that the signature is effective in favor of a purchaser for value and without notice of the lack of authority if the signing has been done by
>
> (a) an authenticating trustee, registrar, transfer agent or other person entrusted by the issuer with the signing of the security or of similar securities or their immediate preparation for signing; or
>
> (b) an employee of the issuer or of any of the foregoing entrusted with responsible handling of the security.

26. I am cognizant of the UCC policy favoring a bona fide purchaser. The result on the facts before me does not violate that policy.

As the late Professor Israels stated: "What Article 8 does is first to make securities, *as defined,* negotiable instruments in the historical legal sense, so that the bona fide purchaser of a security is invulnerable both to issuer's defenses and to adverse claims of ownership. . . ." (Emphasis supplied). Israels, *How to Handle Transfers of Stock, Bonds and other Investment Securities,* 19 Bus.Law 90, 90 (1963). "The concept of a free capital market clearly requires that investment securities be negotiable, so that a bona fide purchaser for value and without notice—*even a purchaser from a thief* —can take the instrument free of defenses of the issuer and equally free of claims or equities of prior ownership." *Brown v. Rosetti,* 7 U.C. C.Rep.Serv. 829, N.Y.L.J., June 4, 1970 p. 17 (Civil Ct., N.Y.Co.) (quoting C. Israel), *rev'd,* N.Y.L.J., Feb. 4, 1971, p. 2 (App. Term 1st Div.) (plaintiff found not to be a bona fide purchaser) (emphasis supplied). *See also* New York Practice Commentary to UCC § 8–101, 62½ N.Y. Uniform Commercial Code at 158 (McKinney 1964).

The bona fide purchaser under Article 8 not only acquires the rights of a purchaser but also takes the security free of adverse claims [UCC § 8–301(2)] so long as he does so without notice of the claim [UCC § 8–302]. "Only *actual* knowledge, or bad faith disregard of suspicious circumstances, can establish notice: negligence is not enough . . . Bad faith 'is not mere carelessness. It is nothing less than guilty knowledge or willful ignorance . . . [The purchaser] is not bound at his peril to be upon the alert for circumstances which might possibly excite the suspicion of wary negligence.'" *Matthysse v. Securities Processing Service, Inc.,* 444 F.Supp. 1009, 1021, 23 U.C.C. Rep.Serv. 435, 452 (S.D.N.Y.1977) (emphasis in original; citations omitted). Thus, one finds under the Uniform Commercial Code not only extraordinary protection afforded a bona fide purchaser but also limitations on the duty to inquire. For example, circumstances must first put a purchaser on notice of a wrongful transfer before a failure to inquire constitutes lack of good faith, or gives rise to an inference of notice of an adverse claim. *See, e. g. Colin v. Central Penn National Bank,* 404 F.Supp. 638, 641 (E.D.Pa.1975), *aff'd,* 544 F.2d 512 (3d Cir. 1976); *Travis Investment Co. v. Harwyn Publishing Corp.,* 288 F.Supp. 519, 526 (S.D.N.Y. 1968).

The question then is: On whom does the loss fall, the issuer or the possessor of a "certificate," where the possessor paid value without actual knowledge or bad faith disregard of suspicious circumstances but the "certificate" was never properly issued and hence is not a security? The answer is mandated by the formal requirements for issuance and by analogy to the situation of counterfeit currency. As discussed in this opinion, the UCC has prerequisites to the characterization of a document as a "security," and one of the prerequisites is issuance. The formal requirements for issuance may, in some instances, impose loss upon a "good faith" possessor; however, this accords with the imposition of loss upon a person who in good faith comes into possession of counterfeit currency.

value by innocent third parties. Bankhaus also claims that the defendants neglected to make proper efforts to notify plaintiff and others similarly situated within a reasonable time following the disappearance of the engravings.

█ For the reasons hereafter stated, summary judgment is granted in favor of all defendants on plaintiff's second and third causes of action.[27]

## A. Choice of Law

█ In determining which law to apply, I must follow choice of law principles developed by New York, the forum state. *Klaxon Co. v. Stentor Manufacturing Co., supra.* Pursuant to *Babcock v. Jackson,* 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963), and its progeny, choice of law for torts actions is determined by a government interest analysis, i. e., which forum has the most significant contacts with the facts and parties; which forum has a greater interest in having its policies, as reflected in the relevant law, applied? *See also Neumeier v. Kuehner,* 31 N.Y.2d 121, 335 N.Y.S.2d 64, 286 N.E.2d 454 (1972).

█ Plaintiff argues that German law, which follows a comparative negligence standard, is applicable. I disagree. Applying the "governmental interest" test discussed above, I find that New York substantive law applies.

As defendant ACF points out, Bankhaus itself has alleged substantial New York contacts in its complaint and amended complaint. The loss or theft occurred in New York. Any allegedly negligent acts or omissions by four of the five defendants (ACF, American, Emery, and National) occurred in New York. It is significant that on the face of the ACF engraving the following appeared: "Reference is made to the [Equipment Trust] Agreement (copies of which are on file with the Trustee at its said office) for a more complete statement of the terms and provisions thereof, to all of which the registered holder hereof, by accepting this Certificate, assents." The Equipment Trust Agreement provides that New York law should govern the rights and obligations of the parties with respect to the instrument. Bankhaus, desirous of being a registered holder, is deemed to be on notice of the above provision and its consequences. Furthermore, defendants performed no act to invoke or avail themselves of German law, whereas Bankhaus knew it was dealing with an American instrument.

█ Plaintiff's cause of action arose prior to September 1, 1975. Therefore, I must apply the New York rule of contributory negligence which obtained prior to that date. *See* N.Y.C.P.L.R. § 1413 (McKinney 1976).

## B. Plaintiff Was Contributorily Negligent

I conclude that under New York law any claims plaintiff may have due to negligence by defendants are forfeited due to plaintiff's contributory negligence.

█ To establish actionable negligence, plaintiff must demonstrate 1) a duty owing by defendants (or any of them) to the plaintiff, 2) a breach of that duty and 3) injuries proximately resulting from such a breach. *Nieves v. Manhattan & Bronx Surface Transit Operating Auth.,* 31 A. D.2d 359, 360, 297 N.Y.S.2d 743, 744 (1st Dep't), *leave to appeal denied,* 24 N.Y.2d 1030, 302 N.Y. S.2d 1026, 250 N.E.2d 253 (1969).

Defendants owed duties to plaintiff to safeguard the transportation of the ACF engravings (which resembled securities and which were intended after completion by Mercantile in Baltimore to be issued as se-

**27.** Although summary judgment is generally inappropriate in tort cases, there are tort cases wherein such relief is appropriate. *Brown v. Gamm,* 525 F.2d 60, 61 (8th Cir. 1975). I find, in light of my holding, *infra* at p. 1147, that no reasonable jury could find for plaintiff, that summary judgment is appropriate in the case before me. *See Sartor v. Arkansas Gas Corp.,* 321 U.S. 620, 624, 64 S.Ct. 724, 88 L.Ed. 967 (1944); *United States v. J. B. Williams Co., Inc.,* 498 F.2d 414, 432 (2d Cir. 1974) (citing, *inter alia,* 6 *Moore's Federal Practice* ¶¶ 56.-02[10], 56.04[2], 56.15).

curities) from a loss or theft, and at least as to some defendants, to notify the financial community of the theft.[28] Whether or not defendants were negligent in performing their duties entails material questions of fact which should not be determined on a motion for summary judgment.

In normal course the existence of such material questions of fact would foreclose summary judgment. However, my finding, *infra,* that there are no material issues of fact with respect to plaintiff's contributory negligence, and that plaintiff was contributorily negligent as a matter of law, renders irrelevant the existence of material issues of fact with respect to defendant's negligence.

Under the New York doctrine of contributory negligence which obtained in 1973, plaintiff also was required to observe a duty of care in its operations.

"Contributory negligence is conduct on the part of the plaintiff, contributing as a legal cause to the harm he suffered, which falls below the standard to which he is required to perform for his own protection. . . . [T]he plaintiff is denied recovery because his own conduct disentitles him. . . ." W. Prosser, *The Law of Torts,*

¶ 65 at 416–17 (4th ed. 1971). Under the doctrine of contributory negligence, the *slightest* negligence on the part of plaintiff will bar recovery. *Fitzpatrick v. International Railway Co.,* 252 N.Y. 127, 134, 169 N.E. 112 (1929). *See also Bacon v. Celeste,* 30 A.D.2d 324, 325, 292 N.Y.S.2d 54 (1st Dep't 1968). The proof of freedom from contributory negligence is not only plaintiff's burden, but it is also "a substantive part of the plaintiff's right to recover." *Fitzpatrick, supra,* 252 N.Y. at 133–34, 169 N.E. at 115. *See also* J. Prince, *Richardson on Evidence* (9th ed. 1964) § 104 at 81.

■■■ I find that Bankhaus was contributorily negligent as a matter of law. On the undisputed facts before me, no reasonable jury could find, by a preponderance of the evidence, that Bankhaus was free from contributory negligence. Bankhaus' negligence consisted, *inter alia,* in failing to investigate Grimmsmann, who presented the engravings; in ignoring defects and inconsistencies on the engravings themselves; in failing to consult with experts in American securities; in making loans on the basis of the ACF engravings as collateral when ACF securities had not been 1) proposed as collateral by the borrower, or 2) approved

---

**28.** As then Chief Judge Cardozo stated in *Palsgraf v. Long Island R. R. Co.,* 248 N.Y. 339, 344–45, 162 N.E. 99, 100 (1928):

The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension. . . . The range of reasonable apprehension is at times a question for the court, and at times, if varying inferences are possible, a question for the jury.

In 1971, hearings took place before the Permanent Subcommittee on Investigations of the United States Senate Committee on Government Operations, Ninety-Second Congress, first session. These investigations revealed a "systematic planning and united effort" on the part of organized groups of criminals to steal securities, particularly at airports. At Kennedy, in a 33 month period, $70 million of securities had been stolen. A common means of disposing of the stolen securities for profit was to pledge them as collateral for loans to banks, both domestic and foreign, with an increased emphasis upon foreign banks. Defendant American, through its general manager for securities

sales, had received a copy of the 5-volume hearing transcript.

During the period from January 1, 1970 through March 22, 1973 (the date of the loss of the ACF engravings), there were seven occasions on which documents printed by American Bank Note or a subsidiary were lost or stolen. In three instances, Emery was the carrier, and in one instance National was the carrier. Louis Hindenlang of American has testified that in October of 1970 he knew about the thefts of securities from carriers.

Plaintiff has also supplied this court with a newspaper article publicizing the risk of transporting securities. This account involved the theft of securities being transported from American to Mercantile which were stolen at Kennedy. The article states that "[s]ecurity thereafter became a major law enforcement problem" and that the stolen goods were, in many instances, used by the thieves as collateral for bank loans. In sum, what emerges from the record is the reasonably perceived risk of loss, and of the use of stolen securities and incomplete engravings to collateralize loans.

as collateral by Bankhaus' own Central Credit Office.[29]

No adequate investigation was made of Grimmsmann, who presented the engravings, and his false claim to be a chartered public accountant was accepted at face value.

Bankhaus ignored defects which were readily ascertainable upon inspection of the engravings. The instruments accepted by Bankhaus were incomplete on their face. They were neither attested to by the Assistant Corporate Trust Officer of Mercantile nor dated within the blank spaces especially provided on the engravings for those purposes. (*See also* the investigative report prepared by Bankhaus' own staff following the Grimmsmann affair, *supra*, 1140.

Certain of the engravings accepted by Bankhaus were inconsistent on their face. Thus the engravings purportedly registered to (and transferred by) "Bald & Co." bore a manually stamped transfer date of March 2, 1973, which date anteceded the date of the Equipment Trust Agreement (March 15, 1973) as printed on the engraving.

Even though Bankhaus admits to being inexperienced with American securities, there was no attempt by Bankhaus to consult with anyone experienced in American securities during the loan transactions. Only after some $1,405,000 had been advanced on the collateral of the stolen engravings, and some 12 days after more than $1,000,000 had been advanced, did Bankhaus consult with outside experts, who al-

most immediately characterized the instruments as "suspicious" and noted the missing dates and attestation signatures.[30]

Bankhaus advanced the initial $140,000 to Grimmsmann prior to receiving confirmation from its own legal department. In addition, the legal department merely assumed that Grimmsmann "was a registered holder on some books . . . somewhere" without investigating further.

SO ORDERED.

**29.** Neither Grimmsmann's loan request nor Bankhaus' Rush Resolution listed ACF certificates as being part of the proposed collateral.

**30.** When Grimmsmann sought a further temporary loan of $400,000 so that he could purchase an additional $4,800,000 of American securities—a rationale which cried for further inquiry on its face—the further loan was promptly made.

It would not suffice for Bankhaus to demonstrate that such inexperience is common to the majority of German banks, as plaintiff suggests. I note, in this regard, that the German court which sentenced Grimmsmann indicated that Grimmsmann had approached a different German bank (Bank fur Handel und Efferten of Zurich ["BHE"]) prior to contacting Bankhaus.

Mr. Kohler, a board member and partner of BHE, noticed the missing dates and attestation signatures immediately upon inspection, as did his Securities Department, and refused to increase an already existing loan to Grimmsmann on the basis of the ACF engravings.

The German court, making reference to the missing date and attestation signature, stated: "This can be readily noted by any reader of the text upon critical examination." The court also concluded that Bankhaus did not look closely at the instrument and omitted any inquiry as to the engravings' origin. The court concluded that the initial advance of $140,000 to Grimmsmann was "a result of the error on part of the employees" of Bankhaus.