DEMPSEY–TEGELER & CO., Inc., a Delaware corporation, Plaintiff,

v.

OTIS OIL & GAS CORPORATION, a Colorado corporation,

and

William B. Tilton, an individual, Defendants.

Civ. A. No. C–709.

United States District Court
D. Colorado.

Nov. 26, 1968.

**1384**

Holme, Roberts & Owen, Peter H. Holme, Jr. and Donald K. Bain, Denver, Colo., for plaintiff.

Keller & McSwain, John G. Herbert, Denver, Colo., for defendant Otis Oil & Gas Corp.

Winner, Berge, Martin & Camfield, Warren O. Martin, Denver, Colo., for defendant William B. Tilton.

## MEMORANDUM OPINION AND ORDER

WILLIAM E. DOYLE, District Judge.

This is a diversity suit growing out of an attempted transfer of 320,000 shares of the common stock of defendant Otis Oil & Gas Corporation. When the shares were presented for transfer, the defendant Otis took the position that they were invalidly issued and on that ground refused to transfer them. Plaintiff's claim is for damages allegedly resulting from this refusal. All of the parties have moved for summary judgment. Briefs have been filed, the case has been argued orally, and the matter now stands submitted.

The facts as disclosed by the file show that during the period commencing in May and continuing to August 1967, the defendant William B. Tilton requested the plaintiff to sell a total of 320,000 shares of common stock of Otis, which shares were owned by Tilton. Six certificates representing these shares were delivered to the plaintiff. Plaintiff contracted over a period of time to sell a total of 237,000 of the shares to M. H. Meyerson and Co., Inc., of Jersey City, New Jersey, and remitted to Tilton from time to time anticipated net proceeds amounting to $77,512.50 from the sale of the shares.

Prior to delivering the certificates to Meyerson, plaintiff delivered the certificates to Otis and demanded that Otis transfer the shares to plaintiff and issue new certificates in plaintiff's name. This was in expectation of delivering 237,000 of the 320,000 shares to Meyerson. Otis registered the transfer of 20,000 shares represented by two of the certificates, but refused to register the remaining 300,000 shares on the ground that the four certificates representing these latter shares were not validly issued.

Plaintiff alleges that it is a bona fide purchaser of the 217,000 shares and that it has been called on by Meyerson to deliver 115,200 of the shares, which had to be purchased on the open market at a cost in excess of the price agreed on with Meyerson, amounting to $11,766.00. Apparently there is a continuing obligation running from plaintiff to Meyerson to deliver the balance of 101,800 shares. Demand is made for judgment in the amount of $83,358.50.

Other claims are asserted against the defendant William B. Tilton. These are based on various theories, including plaintiff's right to indemnity, unjust enrichment and breach of warranties.

It would appear from the facts disclosed in the affidavits and available other sources that the four certificates in question were wrongfully removed from Otis' stock book by the secretary of

Otis; that these were negotiated without authority by the secretary and came into the possession of defendant Tilton who, in turn, transferred them to plaintiff.

The certificates do not have manual signatures. Instead, they have facsimile signatures. Moreover, the certificates do not bear a countersignature by a transfer agent, and there is not any legend on the face of the certificates stating that they are not valid unless countersigned by a transfer agent. Such facsimile certificates at the present time carry such a statement.

The motion of plaintiff for summary judgment is based on the proposition that it is a bona fide purchaser of valid, non-counterfeit, and thus genuine certificates, and that, therefore, liability exists as a matter of law. Defendant Otis concedes that there is no material factual issue. It also moves for summary judgment relying on C.R.S.1963, § 31–4–8 which provides:

> "The shares of a corporation *shall* be represented by certificates signed by the president or a vice-president and the secretary or an assistant secretary of the corporation, and may be sealed with the seal of the corporation or a facsimile thereof. The signatures of the president or vice-president and the secretary or assistant secretary upon a certificate may be facsimiles *if the certificate is countersigned by a transfer agent, or registered by a registrar, other than the corporation itself or an employee of the corporation * * *.*" (Emphasis supplied.)

In essence then plaintiff argues that the certificates are, under the Uniform Commercial Code negotiable instruments, and that the alleged invalidity does not relieve Otis of its duty to recognize and transfer the certificates. Plaintiff argues that the term "genuine" means free of forgery or counterfeiting. Plaintiff says that since the certificates bear no forgery, they are genuine and that plaintiff is entitled to the registration of their transfer.

Thus, the ultimate issue is whether the certificates in question, which have been admittedly issued without authority and are not manually signed, are nonetheless genuine or stated differently whether the statutory requirement of a transfer agent's countersignature on stock certificates bearing facsimile signatures creates invalidity which precludes bona fide purchase.

■ The validity of the certificates and the rights and duties of the defendant Otis with respect to the registration of their transfer are governed by Colorado law.[1] The certificates are securities under Article Eight of the Colorado Uniform Commercial Code, 1963 C.R.S. § 155–8–102, and therefore they are negotiable instruments, 1963 C.R.S. § 155–8–105. Article Eight provides special rules for investment securities, which are meant to ensure rapid and effective negotiation of such instruments, and it is that Article with which we will be primarily concerned in this case.

Under Section 401 of Article Eight, an issuer has a duty to register the transfer of securities as requested if certain preconditions are met.[2] Although the preconditions are clearly met

---

1. Since this is a diversity action, the law of Colorado governs. The Colorado Uniform Commercial Code provides that

> "[t]he validity of a security and the rights and duties of the issuer with respect to registration of transfer are governed by the law (including the conflict of laws rules) of the jurisdiction of organization of the issuer." 1963 C.R.S. § 155–8–106.

Otis is the issuer and is organized under the laws of Colorado.

2. Section 401 provides:

> "Duty of issuer to register transfer —(1) Where a security in registered form is presented to the issuer with a request to register transfer, the issuer is under a duty to register the transfer as requested if:
> (a) The security is indorsed by the appropriate person or persons (section 155–8–308); and
> (b) Reasonable assurance is given that those indorsements are genuine and effective (section 155–8–402); and

in this case,[3] Otis claims that its refusal to register the transfer of the certificates from Tilton to the plaintiff is justified on the ground that the certificates were not validly issued.

In support of its contention that it was justified in its refusal to transfer the certificates, Otis points to the Colorado statutory requirement, 1963 C.R.S. § 31–4–8, that certificates issued with a facsimile signature of the president and secretary must be countersigned by a transfer agent. Admittedly, the certificates failed to satisfy this requirement. However, plaintiff contends that this deficiency does not bar it because it was a bona fide purchaser within the meaning of Section 202(2) (a) of Article Eight of the Commercial Code, which Section provides:

"A security * * * even though issued with a defect going to its validity, is valid in the hands of a purchaser for value and without notice of the particular defect * * *." 1963 C.R.S. § 155–8–202(2) (a).[4]

The initial question is therefore whether plaintiff is a bona fide purchaser for value within the meaning of the above Section. In order for plaintiff to be entitled to the protection afforded by this Section it must prove that it was a purchaser for value, and that either it or Tilton, its transferor, was without notice of the defect in the certificates. The plaintiff is clearly a purchaser, 1963 C.R.S. § 155–1–201(32) and (33), and it paid "value" in excess of $70,000 for the 217,000 shares of stock represented by the certificates in question. Therefore, the crucial question is whether *either* the plaintiff *or* Tilton was without notice of the defect in the certificates. The reason why it is sufficient for *either* the plaintiff *or* Tilton to be without notice of the defect is first, if the plaintiff was without notice of the defect, the defect is ineffective as to it by the express language of Section 202 (2) (a). If Tilton was without notice of the defect (even though the plaintiff did have notice), the defect is still ineffective against the plaintiff by virtue of the umbrella protection given to a purchaser by Section 301 of Article Eight.[5]

In determining whether either the plaintiff or Tilton was without notice of

---

(c) The issuer has no duty to inquire into adverse claims or has discharged any such duty (section 155–8–403); and

(d) Any applicable law relating to the collection of taxes has been complied with; and

(e) The transfer is in fact rightful or is to a bona fide purchaser.

(2) Where an issuer is under a duty to register a transfer of a security, the issuer is also liable to the person presenting it for registration or his principal for loss resulting from any unreasonable delay in registration or from failure or refusal to register the transfer." 1963 C.R.S. § 155–8–401.

3. It is undisputed that: the certificates in question were in registered form; the certificates were indorsed by the appropriate persons (Ahearn, Ogg and Tilton); the indorsements are genuine and effective (all the indorsements were verified as genuine by reputable banks); there are no adverse claims by previous holders; and the transfer from Tilton to the plaintiff was in itself rightful (that is, the transfer itself did not violate any law or public policy).

4. The official comment to this Section of the Code states:

"By subsection (2) a security 'is valid' in the hands of a purchaser for value without notice of a particular defect even if the defect is so serious as to be described as one 'going to the validity' of the security. * * * Notice that 'purchaser' includes a person taking from the company on original issue (Section 1–201) * * *.

*      *      *      *      *

Following the basic principles of the Negotiable Instrument Law the cases have generally held that an issuer is estopped from denying representations made in the text of a security. * * * Nor is a defect in form or the invalidity of a security normally available to the issuer as a defense. Bonini v. Family Theatre Corporation, 327 Pa. 273, 194 A. 498 (1937); First National Bank of Fairbanks v. Alaska Automotive, 10 Alaska 62, 119 F.2d 267 (C.C.A.Alaska 1941)."

5. Section 301 provides:

"(1) Upon delivery of a security the purchaser acquires the rights in the

the defect in the certificates, we look to the Colorado Uniform Commercial Code's definition of "notice." Section 201(25) of Article One defines notice as:

"A person has 'notice' of a fact when:

(a) He has actual knowledge of it; or

(b) He has received a notice or notification of it; or

(c) From all the facts and circumstances known to him at the time in question he has reason to know that it exists. A person 'knows' or has 'knowledge' of a fact when he has actual knowledge of it. 'Discover' or 'learn' or a word or phrase of similar import refers to knowledge rather than to reason to know. The time and circumstances under which a notice or notification may cease to be effective are not determined by this chapter." 1963 C.R.S. § 155-1-201(25).

■ There is no triable dispute as to whether plaintiff, or Tilton for that matter, had actual notice of the unauthorized issuance of the certificates.[6]

Indeed, it does not appear for that matter that the plaintiff was aware of the provision in the Colorado law requiring that certificates issued with facsimile signatures of the president and the secretary be countersigned by a transfer agent. As noted previously, the certificates did not contain a statement that they were void unless countersigned by a transfer agent. Moreover, it does not appear from the file that there were facts or circumstances known to the plaintiff or to Tilton which would have put them on notice of the illegality issue or of the deficiency arising from the failure of the transfer agent to countersign them. It may well be therefore that the plaintiff and Tilton qualify as purchasers for value and without notice.

There is, however, a residual troublesome question and that is whether the plaintiff is charged with notice of the Colorado Statute, 1963 C.R.S. § 31-4-8. This is after all a matter of law as to which there is a presumption of knowledge. Furthermore, whether notice of this deficiency deprives the plaintiff and

security which his transferor had or had actual authority to convey, except that a purchaser who has himself been a party to any fraud or illegality affecting the security or who as a prior holder had notice of an adverse claim cannot improve his position by taking from a later bona fide purchaser. * * *" 1963 C.R.S. § 155-8-301. Under this Section, the plaintiff acquired the rights in the security which Tilton, its transferor, had. If Tilton was without notice of the defect in the certificates, then the defect was ineffective against him by virtue of Section 202(2)(a) and he had the right to require Otis to transfer the certificates. Therefore, when the plaintiff purchased the certificates from Tilton it acquired Tilton's right to require Otis to transfer the certificates. (There is not even a hint in the record that the plaintiff was a party to any fraud or illegality affecting the certificates, or that the plaintiff was a prior holder of these certificates.)

6. Rolla J. Gittins, executive vice president and director of the plaintiff, stated in his affidavit that:

"At no time prior to plaintiff's payment to Tilton described above, did

plaintiff, or its officers, agents or employees involved in this matter, have any notice or knowledge of irregularities in the four certificates in question or any knowledge that they were invalid."

William B. Tilton stated in his affidavit: "That he purchased all of said certificates believing them to be genuine and relying upon the statements contained upon the face of said certificates, together with the notation that the signature was guaranteed by a reputable Bank and Trust Company in Houston, Texas.

That he tendered the certificates to Plaintiff, Dempsey-Tegeler for sale in their regular course of business, without knowledge, actual or implied, that the Defendant, Otis Oil and Gas Corporation, would refuse to transfer all or any of the shares.

At no time prior to notification by Plaintiff, Dempsey-Tegeler that Defendant, Otis Oil and Gas Corporation, had refused to transfer said stock did affiant have any notice or knowledge of irregularities in the four (4) certificates in question or any knowledge, actual or implied, that they were invalid."

Tilton of their standing as purchasers for value without notice is a source of uncertainty. Neither counsel for the plaintiff nor counsel for the defendant have researched this issue.

 The main thrust of the defendant's argument is that the noncompliance with 1963 C.R.S. § 31–4–8 renders the certificates *nongenuine* whereby its defense is absolute—i. e., effective even against a purchaser for value and without notice under § 202(3) of the Commercial Code. In our view this is wholly without merit. We believe that the certificates are indeed genuine under the Uniform Commercial Code.[7] The definition in the Code, § 201(18) of Article One is limited to a certificate which is forged or counterfeited. It provides: " 'Genuine' means free of forgery or counterfeiting." Even though the certificates were issued without authority, it cannot be said that the signatures were either forged or counterfeit, and so in that sense they were effective against the issuer Otis. Admittedly, the certificates came directly out of the stock book of Otis and were signed by the president and secretary. Consequently, under the definition contained in the Code, the certificates were genuine.

In view of the fact that there is an issue of law in the case which has not been briefed or argued, it is necessary to hear further arguments and it seems desirable also to hear the case on the merits, that is, proofs as to the circumstances surrounding the issuance of these certificates. It seems likely that the defendant Otis was at fault in permitting the certificates to come into the hands of plaintiff and Tilton, and that Otis might, as a result, be precluded from asserting the defense of unauthorized issuance.

For the reasons stated, the several motions for summary judgment be and the same are hereby denied. The Clerk is directed to set the case for trial in the immediate future.

---

7. Section 202(3) provides:
"Except as otherwise provided, in the case of certain unauthorized signatures on issue (section 155–8–205), lack of genuineness of a security is a complete defense even against a purchaser for value and without notice." 1963 C.R.S. § 155–8–202(3).
For the purposes of this case, the most important part of this Section is the exception clause, which clearly excepts from the Section's coverage unauthorized signatures and directly refers to Section 155–8–205. Section 205 provides:
"Effect of unauthorized signature on issue—An unauthorized signature placed on a security prior to or in the course of issue is ineffective, except that the signature is effective in favor of a purchaser for value and without notice of

the lack of authority if the signing has been done by:
* * *
(b) An employee of the issuer * * * entrusted with responsible handling of the security." 1963 C.R.S. § 155–8–205.
Since both plaintiff and Tilton were purchasers for value and were without notice of the lack of authority, and the signing was done by the secretary of Otis who was an employee entrusted with responsible handling of the security, it is readily apparent that the facsimile signatures are effective in favor of the plaintiff and against Otis. Therefore, the certificates are genuine even though the signatures of the president and secretary of Otis were unauthorized.