NEW JERSEY BANK, N. A., Appellee,

v.

BRADFORD SECURITIES OPERATIONS, INC., Bradford Securities, Manufacturers Hanover Trust Company, and Bankers Trust Company.

Appeal of BRADFORD SECURITIES OPERATIONS, INC.

No. 81–2964.

United States Court of Appeals, Third Circuit.

Argued May 24, 1982.

Decided Sept. 30, 1982.

Donald A. Klein, Winne, Banta & Rizzi, Hackensack, N. J., Mark C. Cohen (argued), Louis J. Maione (argued), Bradford Nat. Corp., Legal Div., New York City, for appellant; Arthur N. Lambert, New York City, of counsel.

Allan A. Maki (argued), Allan A. Maki, P. A., Paterson, N. J., for appellee.

Before SEITZ, Chief Judge, and SLOVITER and BECKER, Circuit Judges.

## OPINION OF THE COURT

EDWARD R. BECKER, Circuit Judge.

Article 8 of the Uniform Commercial Code ("UCC"), dealing with Investment Securities, provides the framework for this diversity action brought by appellee New Jersey Bank, N.A., ("NJB") against appellant Bradford Securities Operations, Inc. ("BSOI"). NJB seeks recovery from BSOI for damages it sustained when an NJB customer defaulted on a loan, the collateral for which consisted of securities that had been stolen from BSOI and subsequently forged. Although it found that section 8–205 of the UCC provided a complete defense to NJB's Article 8 claim for the value of the forged securities, the district court nevertheless held BSOI liable to NJB on a negligence theory, ruling that BSOI's negligent handling and safeguarding of the blank certificates constituted a breach of its duty to NJB. The court further found that NJB had not been contributorily negligent.

The principal question raised in this appeal is whether the court's acceptance of a UCC defense characterized by the Code as "complete" forecloses the assertion of a common-law negligence claim. Underlying this question is the status of parallel common-law remedies for violations already redressable under the Code. Concluding that NJB's failure to prevail on an Article 8 claim does not necessarily foreclose a common-law right of recovery, and that the trial court's findings on negligence and contributory negligence were not clearly erroneous, we affirm the judgment below.

I.  *History of the Case*

During the years 1976 and 1977, BSOI contracted with Bankers Trust Company, the transfer agent for Southern California Edison Company ("SCE"), to act as an

agent of Bankers Trust in executing transfers of SCE stock. On March 4, 1977, BSOI received a shipment of several thousand SCE stock certificates bearing the facsimile signatures of SCE's corporate officers. The signature spaces for the transfer agent (Bankers Trust) and the registrar, Manufacturers Hanover Trust Company, remained blank, as did the space for the name of the stock owner. To issue the certificate, BSOI would sign as transfer agent on behalf of Bankers Trust and forward the certificate to the registrar for its counter-signature and for recordation of the stock-owner's name.[1]

In July 1977, BSOI discovered that 500 SCE certificates were missing from the vault in which it had stored the blanks. The resulting investigation disclosed that the certificates had been stolen between March 4 and March 17, 1977, but law-enforcement authorities were unable to identify how or by whom the theft had been accomplished. Investigators eventually traced some of the missing certificates to NJB, which had accepted them as collateral for a series of loans made to Herman H. Rhodes.

The loan transactions with Rhodes began in 1976, when NJB authorized an unsecured loan of $2,700 to help re-establish Rhodes' credit, which had been destroyed in a 1974 personal bankruptcy. NJB's credit check had revealed the existence of litigation related to the bankruptcy, but NJB made no further inquiries about the earlier proceeding. At the time of the loan, Rhodes was employed by Reynolds Securities and had

projected annual earnings in excess of $100,000.

In March 1977, NJB agreed to loan Rhodes $60,000, for which Rhodes pledged as collateral 50 certificates representing 5,000 shares of SCE stock registered in Rhodes' name. Rhodes presented the bank with a sales slip from Reynolds Securities evidencing his purchase of the SCE shares. Before executing the loan, NJB verified Rhodes' 1976 income (in excess of $96,000) and 1977 income ($36,000 in the first quarter). The bank also checked the serial numbers of the certificates against the national "hot list" of stolen certificates; the certificates were not listed because the theft had not yet been discovered or reported by BSOI. At about this time, Rhodes joined Thomson McKinnon as a vice president. In June 1977, based on a new projection of Rhodes' earnings at more than $180,000, the bank increased Rhodes' loan to $84,000, with the same securities serving as collateral.

Following the seizure of the forged certificates by the Federal Bureau of Investigation in December 1978, NJB obtained a judgment against Rhodes for $93,585, representing the principal and interest owed on the loan plus attorneys' fees. The bank also made a demand on BSOI to accept the certificates or pay the face value of the stock. BSOI refused, and NJB instituted this suit in August 1979 against BSOI, Bradford Securities (an entity that does not exist), Bankers Trust Company, and Manufacturers Hanover Trust Company.[2]

As we have noted, NJB asserted claims under both the UCC and common-law negli-

---

1. The district court described the role of the various participants in the process as follows:

   In order for a new blank stock certificate to become effective it must be "issued." This requires that the blank certificate be signed by authorized signers of both the transfer agent and the registrar for the particular issue. Upon receipt of an old stock certificate of SCE ... stock accompanied by proper instructions to issue a new certificate, BSOI would sign and authenticate a new certificate on behalf of the Transfer Agent [Bankers Trust]. The old and new certificates then would be sent to the registrar, Manufacturers Hanover Trust Company, for verification and signing. After verification, both certificates

   would be returned to BSOI who then would cancel the old certificate and mail out the new certificate to the registered owner.

   *New Jersey Bank, N. A. v. Bradford Securities Operations, Inc.,* No. 79–2678, slip op. at 2 (D.N.J. Oct. 7, 1981).

2. NJB filed the action in the Superior Court of New Jersey, Law Division, Passaic County. BSOI removed the action to federal court in September 1979 on the basis of diversity of citizenship. None of the other named defendants was served with the complaint, and the district court dismissed the case as to these parties after trial.

gence principles. The complaint alleged that NJB took the stock as a bona fide purchaser,[3] without notice of the theft, and that the defendants were liable under UCC Article 8 "in their capacities as Transfer Agent, Registrar, and as issuing agents in the issuance of the securities." Complaint at ¶ 5. NJB did not plead its Article 8 claim with particularity, but it would appear that NJB intended to rely upon section 8–202(2)(a),[4] which provides that a security "is valid in the hands of a purchaser for value and without notice of the particular defect"; section 8–301(1),[5] which confers upon a purchaser the "rights in the security which his transferor had or had actual authority to convey . . ."; and section 8–301(2),[6] which accords to a bona fide purchaser the rights of a "purchaser," see 8–301(1), as well as title "free of any adverse claim." Although these Code sections speak only to the rights of a bona fide purchaser *vis a vis* an issuer, section 8–406(1)[7] provides that a transfer agent or other agent of the issuer has the same obligations, rights, and privileges as does its principal. Thus, NJB sought to require BSOI, under Article 8, to pay the full value of the SCE certificates. In addition, the complaint alleged that the defendant(s) negligently failed to take precautions necessary to prevent the securities from being issued in Rhodes' name; to report promptly that the certificates had been stolen; and "to provide proper protecting [sic] custody of the securities, resulting in the plaintiff sustaining a loss in reliance upon . . . the securities pledged as collateral for the Rhodes loan, which appeared genuine with all necessary signatures appearing thereon." Complaint at ¶ 6.

In defending the action below, BSOI asserted that: (1) the certificates never had been issued and thus were not "securities," as defined by Article 8; (2) even if the certificates were deemed to be "securities," section 8–202(3)[8] provided a complete defense because the securities were not genuine; (3) there could be no finding of negligence because BSOI's operating procedures for safeguarding the certificates were reasonable; and (4) NJB's failure to investigate the details of Rhodes' bankruptcy and to verify the authenticity of the certificates constituted contributory negligence suffi-

3. Article 8 defines a "bona fide purchaser" as "a purchaser for value in good faith and without notice of any adverse claim who takes delivery of a security in bearer form or of one in registered form issued to him or indorsed to him or in blank." Section 8-302.

4. Pursuant to section 8-202(2)(a):
   A security other than one issued by a government or governmental agency or unit *even though issued with a defect going to its validity is valid in the hands of a purchaser for value and without notice of the particular defect unless the defect involves a violation of constitutional provisions in which case the security is valid in the hands of a subsequent purchaser for value and without notice of the defect.

5. Section 8 301(1) provides:
   Upon *delivery of a security the purchaser* acquires the rights in the security which his transferor had or had actual authority to convey except that a purchaser who has himself been a party to any fraud or illegality affecting the security or who as a prior holder had notice of an adverse claim cannot improve his position by taking from a later bona fide purchaser. "Adverse claim" includes a claim that a transfer was or would be wrongful or

that a particular adverse person is the owner or has an interest in the security.

6. Under 8–301(2), "[a] bona fide purchaser in addition to acquiring the rights of a purchaser also acquires the security free of any adverse claim."

7. Section 8–406(1) decrees:
   Where a person acts as authenticating *trustee, transfer agent, registrar, or other* agent for an issuer in the registration of transfers of its securities or in the issue of new securities or in the cancellation of surrendered securities
   (a) he is under a duty to the issuer to exercise good faith and due diligence in performing his functions; and
   (b) he has with regard to the particular functions he performs the same obligation to the holder or owner of the security and has the same rights and privileges as the issuer has in regard to those functions.

8. Section 8–202(3) states: "Except as otherwise provided in the case of certain unauthorized signatures on issue (Section 8–205), lack of genuineness of a security is a complete defense even against a purchaser for value and without notice."

cient to bar recovery under New Jersey's comparative negligence statute, N.J.S.A. 2A:15–5.1 (1982). The district court, in an unpublished opinion, concluded that the certificates were "securities"; agreed that BSOI could assert the lack-of-genuineness defense under Article 8;[9] found that BSOI had been negligent in its handling of the certificates; and ruled that NJB had not been contributorily negligent. It therefore found BSOI liable to NJB and assessed damages at $93,585.06.

BSOI asserts several arguments on appeal: first, that the trial court erred in ruling that the forged certificates were "securities," as the shares never had been issued; second, that the court should not have considered NJB's negligence claim once it had determined that the certificates were not genuine and thus fell within the lack-of-genuineness defense; and third, that the findings on negligence and contributory negligence were clearly erroneous. We take up these contentions in that order.

## II. *NJB's Uniform Commercial Code Claim*

BSOI's threshold challenge maintains that the certificates are not "securities" under section 8–102 of the UCC, which, in pertinent part, defines a "security" as "an instrument which . . . is issued in bearer or registered form." BSOI contends that, because the certificates were stolen prior to issuance, they cannot be "securities" but are only "worthless pieces of paper." BSOI relies on *Bankhaus Hermann Lampe KG v. Mercantile-Safe Deposit and Trust Company,* 466 F.Supp. 1133 (S.D.N.Y.1979), in which the district court ruled that blank certificates, stolen en route from the engraver to the issuer and subsequently forged, did not meet Article 8's definition of "securities." Because Article 8 does not define "issue," the *Bankhaus* court looked for guidance to Article 3, which governs negotiable instruments. Section 3–102(1) defines "issue" as "the first delivery of an instrument to a holder or a remitter." "Delivery," in turn, means a "voluntary transfer of possession." Section 1–201(14). The court found "no possibility" of a voluntary transfer of possession because the certificates never had reached the issuer; thus, there was no "issue" of "securities."

The district court distinguished *Bankhaus* and concluded that the certificates held by NJB were "securities." The court reasoned that the certificates in *Bankhaus* never had been in the hands of an organization or agent authorized to issue them, whereas SCE, by contrast, had had actual possession of its stock certificates and had sent them to BSOI for storage. These facts thus "created the possibility of a 'voluntary transfer of possession.'"

We need not decide the correctness of the trial court's ruling on this definitional issue, for, even assuming the certificates to be "securities," we agree with the district court that they are invalid under section 8–202(3). That section states: "Except as otherwise provided in the case of certain unauthorized signatures on issue (Section 8–205), lack of genuineness of a security is a *complete defense* even against a purchaser for value and without notice."[10] (Emphasis added.) Section 8–205 sets out the exception specified in section 8–202(3): an issuer will be liable to a bona fide purchaser if, but only if, the unauthorized signature is that of an employee or agent of the issuer entrusted with the signing of the certificates or with the responsible handling of

---

9. The district court properly applied the conflict-of-laws rules of New Jersey to determine the claim asserted under Article 8. *See Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). New Jersey has adopted the UCC. N.J.S.A. 12A:1–101 to 11–108 (1982). Under UCC § 8 106, the law of the issuer's jurisdiction governs the validity of securities. SCE is organized under the law of California. California, however, also has adopted the UCC, *see* West's Ann.Com.Code §§ 1101 to 11109 (1982), and does not, as far as we can ascertain, construe Article 8 differently from New Jersey. Hence, the statutory law is the same in both jurisdictions. Citations therefore refer directly to the UCC.

10. "Genuine" is defined as "free of forgery or counterfeiting." Section 1–201(18).

such documents.[11] As the signatures' lack of authenticity was not disputed at trial, BSOI was entitled to assert the "complete defense" provided by section 8–202(3), thus shifting to NJB the burden of proving that the signatures were authorized.[12]

BSOI argued that NJB failed to produce at trial any evidence that the signatures were those of BSOI employees authorized to sign the certificates. The district court agreed, finding no merit in the contention that the mere fact of theft from BSOI's custody was sufficient evidence that a BSOI employee was responsible for the unauthorized signatures. Nor did the court see any evidence of a link between an employee of BSOI and Rhodes. Having determined that NJB failed to prove that the certificates fell within section 8–205's exception, the court concluded that section 8–202(3)'s lack-of-genuineness defense was available to BSOI.

NJB nevertheless contends here, as it did below, that the certificates are valid whether the signatures are real or forged,[13] interpreting the introductory language of section 8–205, *supra* note 11, to make *all* unauthorized signatures, including forgeries under section 1–201(43),[14] effective against a bona fide purchaser. Because a forgery, by definition, can never be authorized, reasons NJB, subsections (a) and (b) of section 8–205, which require that the signature be affixed by a person entrusted with authority to sign or handle the certificates, must be inapplicable to a forged signature, as construing section 8–205 to include forgeries effectively would nullify the codified exception for bona fide purchasers.

■ We disagree. NJB ignores the clear language of section 8–205, which declares *all* unauthorized signatures, including forgeries, to be ineffective. The special rule for a bona fide purchaser applies only if (1)

11. Section 8 205 states:

An unauthorized signature placed on a security prior to or in the course of issue is ineffective except that the signature is effective in favor of a purchaser for value and without notice of the lack of authority if the signing has been done by

(a) an authenticating trustee, registrar, transfer agent or other person entrusted by the issuer with the signing of the security or of similar securities or their immediate preparation for signing; or

(b) an employee of the issuer or of any of the foregoing entrusted with responsible handling of the security.

A transfer agent enjoys the same "rights and privileges as the issuer" in performing its functions. Section 8-406.

12. The generally applicable section of the UCC dealing with presumptions is § 8–105(2)(b), which provides that, in any action on a security "when the effectiveness of a signature is put in issue the burden of establishing it is on the party claiming under the signature but the signature is presumed to be genuine or authorized...." Comment 1 instructs that "the particular rules stated in section 3–307 for the negotiable instruments governed by Article 3 are adapted to securities." Thus, to construe the "presumption" established by § 8–105(2)(b), we must refer to § 3–307.

Section 3 307 contains language identical to that in § 8 105(2)(b). Comment 1 explains: [U]ntil some evidence is introduced which would support a finding that the signature is forged or unauthorized the plaintiff is not required to prove that it is authentic. The

presumption rests upon the fact that in ordinary experience forged or unauthorized signatures are very uncommon, and normally any evidence is within the control of the defendant or more accessible to him. He is therefore required to make some sufficient showing of the grounds for his denial before the plaintiff is put to his proof.... Once such evidence is introduced the burden of establishing the signature by a preponderance of the total evidence is on the plaintiff.

Thus, once BSOI established that the SCE certificates had been stolen and subsequently forged, the burden shifted to NJB to prove that the signatures on the certificates were "authorized" within the meaning of § 8–205. Only such a showing could "trump" the lack-of-genuineness defense provided to BSOI by § 8–202(3).

13. NJB did not cross-appeal the trial court's findings; it is entitled, however, to defend the favorable judgment by asserting an alternative theory that appears in the record. *Hankerson v. North Carolina*, 432 U.S. 233, 240 n.6, 97 S.Ct. 2339, 2343 n.6, 53 L.Ed.2d 306 (1977); *Dandridge v. Williams*, 397 U.S. 471, 475 n.6, 90 S.Ct. 1153, 1156 n.6, 25 L.Ed.2d 491 (1970); *United States v. American Railway Express Company*, 265 U.S. 425, 435–36, 44 S.Ct. 560, 563–62, 68 L.Ed. 1087 (1924).

14. Section 1–201(43) of the UCC defines "'unauthorized' signature or indorsement" as "one made without actual, implied or apparent authority and includes a forgery."

the purchaser has taken the certificates for value and without notice *and* (2) the signature is that of a person either responsible for the certificates or authorized to sign. This exception to the lack-of-genuineness defense, as we interpret it, protects an innocent third party from losses occasioned by a dishonest employee of the issuer or transfer agent. But the issuer or its agent bears the risk of loss only when employees within its control are responsible for the unauthorized signature; when a person outside this group commits the forgery, even a bona fide purchaser must succumb to the familiar principle of *caveat emptor*. *Hartford Accident & Indemnity Co. v. Lisky,* 323 F.Supp. 103 (N.D.Ill.1971); *Dempsey-Tegeler & Co., Inc. v. Otis Oil & Gas Corp.,* 293 F.Supp. 1383, 1388 n.7 (D.Colo.1968). Nor are we convinced that a forgery could never qualify for the exception in section 8–205, for the forgery of an authorized signature by a person entrusted with the responsible handling of the certificate might fit within subsection 8–205(b)'s exception. *See Victory National Bank of Nowata v. Oklahoma State Bank, Vinita,* 520 P.2d 675 (Okl.1973) (issuer held liable to bona fide purchaser where an authorized employee forged signature of another authorized employee).

We therefore agree with the district court that NJB cannot invoke this exception unless it can prove that the certificates had been signed by someone entrusted by SCE or its agents with responsibility for signing or handling the documents. We also agree that NJB failed to adduce any evidence implicating a BSOI employee as the forger. The certificates accordingly are without effect even though NJB claims as a bona fide purchaser, and the district court· was correct in ruling against NJB on its UCC claim.

III. *The Matter of Parallel Common-Law Remedies for Code Violations: Does the "Complete Defense" Conferred by Section 8–202(3) Bar NJB's Negligence Claim?*

■ BSOI's second line of attack on the judgment below asserts that the "complete

defense" conferred by section 8–202(3) precludes recovery by NJB on a negligence theory. This argument implicates the status of parallel common-law remedies for violations redressable under the Code.

BSOI does not embellish its "complete defense" contention with either case authority or analysis but rests on the submission that a "complete defense" under the UCC perforce must immunize it from all liability, of any type, to NJB. Although the district court implicitly rejected BSOI's argument by finding for NJB on the negligence claim, it did not discuss this "preemption" contention, and we are not aware of any other decision that has addressed this precise issue. However, after considering the scope of the UCC and the purposes of Article 8, we conclude that BSOI's argument is without merit and that the "complete defense" accorded to BSOI by section 8–202(3) does not bar its liability to NJB on a common-law theory of negligence.

We begin with two basic propositions. First, the UCC is to be "liberally construed and applied to promote its underlying purposes and policies," which include simplifying and clarifying the law governing commercial transactions, fostering the expansion of commercial practices, and standardizing the laws of the various jurisdictions. Section 1–102(1)–(2). Second, the UCC does not purport to preempt the entire body of law affecting the rights and obligations of parties to a commercial transaction. Section 1–103 provides that general principles of law remain applicable unless otherwise preempted by the Code:

Unless displaced by the particular provisions of this Act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.[15]

As a general rule, courts have read these two principles of construction to mean that

---

**15.** The Official Comment to section 1–103 indicates that the listing in this section is "merely illustrative" rather than exhaustive of the legal principles supplementing the Code.

the UCC does not displace the common law of tort as it affects parties in their commercial dealings except insofar as reliance on the common law would thwart the purposes of the Code. 1 R. Anderson, *Uniform Commercial Code* § 1–103:65, at 105 (1981). Thus, in *Morgan Guaranty Trust Company of New York v. Third National Bank of Hampden County,* 400 F.Supp. 383 (D.Mass. 1975), *aff'd,* 529 F.2d 1141 (1st Cir. 1976), the court allowed Morgan Guaranty to sue under Article 8 as well as tort law to recover the value of United States Government securities stolen from Morgan Guaranty and subsequently negotiated as loan collateral by the defendant bank. The court reasoned that suits for tortious conversion, although not provided for by Article 8, must have been envisioned by the authors of the UCC because Article 8 contains a provision insulating good-faith agents and bailees from liability for conversion, *see* section 8–318, and because the "gap" provision of section 1–103 contemplates supplementary causes of action. 400 F.Supp. at 388–89.[16] On the other hand, where Article 8 does provide a comprehensive remedy for parties to a transaction, a common-law action will be barred. *See, e.g., Brannon v. First National Bank of Atlanta,* 137 Ga. App. 275, 223 S.E.2d 473 (1976) (disallowing unjust-enrichment claim in suit for breach

of Article 8's signature warranties because warranties would be rendered meaningless by allowance of common-law claim). We find these cases persuasive.

In the case before us, we find no basis for concluding that a successful lack-of-genuineness defense under section 8–202(3) requires displacement of the common-law negligence claim asserted by NJB. Article 8 was designed to facilitate the negotiability and trading of securities by assigning responsibility for certain steps involved in a stock transfer to the principal parties in the chain, thus relieving each party to the transfer of the need to check all aspects of the transaction—from the validity of the issuance to the validity of the stock-owner's identity and signature—at each step of the stock transfer. *See generally* E. Guttman, *Article 8—Investment Securities,* 17 Rut.L. Rev. 136 (1962). Section 8–202(3) defines the parties' rights and obligations arising out of the security itself and specifies the circumstances under which the issuer must honor the security upon presentation by the purchaser. And the structure of the provision clearly suggests that the defense contained in section 8–202(3) refers only to claims seeking to enforce rights in the security itself;[17] a negligence claim does not fit that description.

16. Although finding for the defendants on the merits, at least two courts have allowed the assertion of negligence counts in addition to an Article 8 claim without commenting on the possible preemption of tort law by Article 8. In *Hartford Accident & Indemnity Co. v. Lisky,* 323 F.Supp. 103 (N.D.Ill.1971), plaintiff surety company sued the issuer of stock in tort, alleging its negligence in allowing unauthorized shares to be issued, and under section 8–205, alleging the validity of the certificates in the hands of a bona fide purchaser. The court ruled in favor of the issuer on both claims, holding that plaintiff had failed to prove the issuer's liability under section 8–205 and that the issuer was not liable in tort because its employee had acted outside his scope of authority in making an unauthorized transfer of shares. Similarly, in *Bankhaus Hermann Lampe KG v. Mercantile-Safe Deposit and Trust Co.,* 466 F.Supp. 1133 (S.D.N.Y.1979), the court ruled in favor of defendant issuer on plaintiff's Article 8 and negligence claims, finding that the certificates were not "securities" and that plaintiff had been contributorily negligent in accepting the certificates as collateral.

17. Because we view NJB's attempt to assert its right to the face value of the SCE stock as an "action on a security," we deem it necessary to comment on section 8–105, which establishes for purposes of "any action on a security" certain presumptions regarding the authenticity of signatures and the validity of the security. According to the Official Comment, note 2, an "action on a security" includes "any proceeding brought against the issuer to enforce a right or interest represented by the security, e.g., to collect principal or interest or a dividend, or to establish a right to vote or to receive a new security under an exchange offer or plan of reorganization."

Section 8–105(2) provides:

(2) In any action on a security

(a) unless specifically denied in the pleadings, each signature on the security or in a necessary indorsement is admitted;

(b) when the effectiveness of a signature is put in issue the burden of establishing it is on the party claiming under the signature but the signature is presumed to be genuine or authorized;

We see no basis for interpreting section 8–202(3) to preempt NJB's action for damages caused by negligent handling of the securities. Recognizing a remedy in tort furthers the policy of Article 8: it promotes the negotiability of securities by placing the risk of loss on the party most able to minimize that risk. *See Girard Bank v. Mount Holly State Bank,* 474 F.Supp. 1225, 1239 (D.N.J.1979). BSOI has failed to overcome section 1–103's presumption that supplementary principles of law, such as the negligence claim proffered by NJB, continue to operate in conjunction with the UCC. We therefore hold that the complete defense under section 8–202(3) does not bar a claim for damages based on a theory of negligence.

## IV. The District Court's Rulings on Negligence and Contributory Negligence

BSOI's third challenge to the judgment below attacks the district court's findings on negligence and lack of contributory negligence. Invoking the rule that a bank must bear any losses incurred in negotiating a forged instrument regardless of the owner's or holder's negligence in allowing it to be forged, BSOI argues that it cannot be held responsible for NJB's losses. BSOI further contends that it had no duty to anticipate the criminal acts of the unknown person(s) who stole and forged the certificates; that it did not breach its duty of care because its safeguards for protecting the blank certificates were reasonable and adequate; and that NJB was contributorily negligent in accepting the securities as collateral for the loans extended to Rhodes. The district court's conclusion that BSOI owed a duty of reasonable care to prevent theft of the certificates is a question of law that is subject to this Court's plenary review, *Huddell v. Levin,* 537 F.2d 726, 734–35 (3d Cir. 1976); the court's findings as to breach of duty, proximate cause, and absence of contributory negligence are subject to reversal only if clearly erroneous. *Id.*[18]

■ We disagree for several reasons with BSOI's contention that it owed no duty of care to NJB. First, BSOI's claim that it had no duty to anticipate the criminal act of forgery is without merit. In effect, BSOI challenges the trial court's finding the proximate cause of NJB's loss to be the negligence of BSOI in allowing the securities to be stolen and not the intervening act of the forger. But we find that the district court correctly applied New Jersey law in holding that a third person's intervening criminal act does not interrupt the causal chain if the defendant reasonably could foresee the possibility of that intervening criminal con-

---

(c) when signatures are admitted or established production of the instrument entitles a holder to recover on it unless the defendant establishes a defense or a defect going to the validity of the security; and

(d) after it is shown that a defense or defect exists the plaintiff has the burden of establishing that he or some person under whom he claims is a person against whom the defense or defect is ineffective (Section 8 202).

Under this subsection, once BSOI asserts a defense relating to the validity of the certificate, the holder of the security (*i.e.* NJB) cannot compel the issuer to honor that security unless NJB successfully can invoke the exception to § 8–202(3)'s lack-of-genuineness defense. Although NJB cannot make such a showing here, its inability to do so does not end the analysis, for this case constitutes more than an "action on a security." NJB also asserts a claim of negligence, to which different rules apply. Section 8–202(4) reinforces this conclu-

sion by providing that "[a]ll *other defenses* of the issuer . . . are ineffective against a purchaser for value who has taken without notice of the particular defense." (Emphasis added.) If we were to adopt BSOI's reading of § 8–202(3)'s "complete defense" language as applying to *all* causes of actions, of whatever type, against an issuer or its agents, *see supra* note 7, we would render totally superfluous § 8–202(4), the mere existence of which seems expressly to contemplate the availability of *other* causes of action to which § 8–202(3) is *not* a complete defense. Section 8–202(4) therefore corroborates our view that the "complete defense" in § 8–202(3) applies only to actions on the security.

**18.** The parties do not dispute the district court's application of New Jersey law to NJB's negligence claim.

duct. *See, e.g., Atamian v. Supermarkets General Corp.*, 146 N.J.Super. 149, 369 A.2d 38, 42 (1976). Thus, we hardly can call clearly erroneous the trial court's determination that BSOI reasonably could have foreseen a theft and forgery resulting from inadequate security measures.

■ Second, BSOI submits that it met its duty of care, inasmuch as it maintained a log system superior to that of another, larger transfer agent and conducted monthly audits of randomly selected certificates stored in the vault; moreover, an independent auditor testified that the system presented "no material weaknesses." After reviewing the record, however, we are unable to perceive any error in the district court's finding of negligence. That ruling was based on the testimony of BSOI's own director of security, who admitted that BSOI failed to keep records either of authorized persons entering and leaving the vault or of certificates removed from the vault and testified that BSOI's "dual access" rule, requiring employees entering the vault to be accompanied by at least one other employee, was not monitored by the company's security office. This testimony supports the district court's findings.

Finally, the main case on which BSOI relies is inapposite. *Moss v. John A. McCrane Motors, Inc.*, 9 N.J. 309, 88 A.2d 195 (1952), presented an appeal by McCrane Motors from a judgment denying cancellation of a chattel mortgage held by respondent bank on an automobile that McCrane had sold to a customer. Hackett, a McCrane salesman, had forged his own name on a blank assignment attached to the certificate of title that he was supposed to have delivered to the car purchaser; he then obtained a new certificate of ownership in his own name and executed the disputed chattel mortgage to secure a loan extended to him by the bank. When the buyer of the automobile sued for (and obtained) rescission of the sale and return of the purchase price, McCrane sought to recover the vehicle. The New Jersey Supreme Court reversed the Superior Court and held that McCrane was entitled to cancellation of the mortgage as against the bank, invoking the general rule that "a bank which advances funds in reliance on a forged instrument must bear the loss," 9 N.J. at 313, 88 A.2d at 197, and rejecting the lower court's placing the loss on McCrane as "the one who made that loss possible," *id.*

But this decision cannot avail BSOI. The New Jersey court found for McCrane because it could not see any "particular circumstances [that would] give rise to an estoppel against the person seeking to assert the forgery," *id.*, and *not* because the conduct of "the one who made [the] loss possible" is never relevant. The *Moss* court expressly determined that the company had not acted negligently in entrusting Hackett with the certificate of ownership for delivery to the purchaser; only for this reason did it find no basis for the bank's assertion of estoppel. By contrast, the district court in the instant case found that BSOI had *not* acted with the requisite due care; thus, BSOI cannot benefit from the general rule acknowledged in *Moss*. *See also Clarke v. Camden Trust Company*, 84 N.J.Super. 304, 201 A.2d 762 (Law Div. 1964), *aff'd*, 89 N.J.Super. 459, 215 A.2d 381 (App.Div.1965) (owner's negligence in allowing instrument to be forged may indeed preclude recovery in an action for conversion against a bank).

■ Nor do we find error in the district court's rejection of BSOI's assertions that NJB was contributorily negligent or that NJB's negligence exceeded BSOI's own, thus barring recovery under New Jersey's comparative negligence statute. N.J.S.A. 2A:15–5.1 (1982). BSOI contends that NJB itself acted negligently in failing both to investigate the details of Rhodes' previous bankruptcy (which investigation would have alerted NJB to Rhodes' prior history of offering forged securities as collateral for loans) and to verify the authenticity of the certificates by contacting the transfer agent or issuer. The district court, however, was entitled to credit the uncontradicted testimony of two local bank officials, who stated that standard banking practice would not require an investigation into the

details of the bankruptcy. This testimony, combined with the fact that Rhodes had substantial past and projected income, permitted the court to find that NJB's lending policies were reasonable. Similarly, the testimony of two witnesses that standard banking practice would not require NJB independently to investigate the certificates' authenticity supported the district court's finding that NJB exercised due care. BSOI's arguments as to NJB's contributory negligence thus are unavailing.

The judgment of the district court will be affirmed.